AO 106A  (08/18)  Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Facebook, 1601 Willow Road
Menlo Park, California 94025

)
)
)
)
)
)

Case No.   '20  MJ3894

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein by reference.

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein by reference.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC § 371 | conspiracy to commit bulk cash smuggling |
| 31 USC § 5332 | bulk cash smuggling |
| 31 USC §§ 5316(a) & 5324(c) | failure to report exporting monetary instruments |

The application is based on these facts:

See Attached Affidavit of Manuel Ramirez, Special Agent of U.S. Homeland Security Investigations, incorporated herein by reference.

❑ Continued on the attached sheet.

❑ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Manuel Ramirez*
_____
*Applicant's signature*

Manuel Ramirez, HSI Special Agent
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 09/03/2020 _____

*William V. Gallo*
_____
*Judge's signature*

City and state:   San Diego, California

Hon. William V. Gallo, U.S. Magistrate Judge
_____
*Printed name and title*

## ATTACHMENT A

Facebook is an internet service provider with computer information systems and other electronic communications and storage systems, records and data located at 1601 Willow Road, Menlo Park, California 94025.

## ATTACHMENT B

### I.  Service of Warrant

The agent executing the warrant shall permit Facebook (the internet service provider ("ISP")), as the custodian of the computer files described in Section II below, to locate the files and copy them onto removable electronic storage media and deliver the same to the officer.

### II.  Items subject to seizure from the ISP

All subscriber and/or user information, all electronic mail, images, text messages, histories, buddy or friend lists, profiles, method of payment, detailed billing records, access logs, transactional data and any other files or records, including identification of other accounts linked to the subject account by cookie values, SMS, recovery, Android device, Apple device, secondary mail, or phone number, associated with the following accounts:

**(1) Vanity Name: Manuel Sepulveda, and**

**account number: 100041647125015; and**

**(2) Vanity Name: Alexa Rodriguez, and**

**account name: alexa.alexardz**

III. The search of the data supplied by the ISP pursuant to this warrant will be conducted by Homeland Security Investigations ("HSI"), and/or the Regional Computer Forensics Lab ("RCFL") as provided in the "Procedures For Electronically-Stored Information" section of the affidavit submitted in support of this search warrant and will be limited to the period of September 3, 2018 through September 3, 2020, and to seizure of:

(a) All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address

(including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b) All activity logs for the account and all other documents showing the user's posts and other Facebook activities from September 3, 2018 through September 3, 2020.

(c) All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from September 3, 2018 through September 3, 2020, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos.

(d) All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

(e) All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string.

(f) All "check ins" and other location information.

(g) All IP logs, including all records of the IP addresses that logged into the account.

(h) All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked."

(i) All information about the Facebook pages that the account is or was a "fan" of.

(j) All past and present lists of friends created by the account.

(k) All records of Facebook searches performed by the account from September 3, 2018 through September 3, 2020.

(l) All information about the user's access and use of Facebook Marketplace.

(m) The types of service utilized by the user from September 3, 2018 through September 3, 2020.

(n) The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number).

(o) All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account.

(p) Communications, records, and attachments tending to discuss or suggest arrangements to recruit individuals to pick up money in the United States.

(q) Communications, records, and attachments tending to discuss or suggest arrangement to recruit individuals to transport United States Currency or other monetary instruments from the United States to Mexico or to another foreign country (that is, country other than the United States).

(r) Communications, records, and attachments tending to discuss or suggest ways to conceal United States Currency or other monetary instruments on a person, in a vehicle, or a compartment, or in some other way, while the money is carried, transferred, or transmitted.

3

(s) Communications, records, and attachments tending to discuss legal requirements to report amounts of United States Currency or other monetary instruments over the amount of $10,000 to the Secretary of the Treasury including FinCEN Form 105 – Report of International Transportation of Currency or Monetary Instruments, documents referencing "CMIR," as well as communications, records, and attachments discussing ways to avoid such reporting requirements;

(t) Communications, records, and attachments tending to discuss or suggest a conspiracy or plan among multiple individuals to recruit individuals to smuggle United States Currency or other monetary instruments from the United States to Mexico or to another foreign country.

(u) Communications, records, and attachments tending to discuss or suggest the origin and/or ownership of the United States Currency or other monetary instruments that is transported or smuggled from the United States to Mexico.

(v) Communications, records, and attachments tending to discuss or relate to the detention, arrest, or criminal investigation of individuals involved in similar smuggling operations, including money laundering, bulk cash smuggling, and drug trafficking (where the courier may have been recruited by an advertisement).

(w) Communications, records, and attachments tending to discuss or suggest income, payments, or reimbursements to co-conspirators, associates, or couriers.

(x) Communications, records, and attachments that provide context to any communications or records described above, such as messages sent or received in temporal proximity to any relevant electronic communications and any electronic communications tending to identify users of the subject accounts.

4

(y) Communications, records, and attachments tending to identify the user(s) of the subject accounts, and any co-conspirators, or associates involved in the activities.

(z) Any other accounts linked to the subject account by cookie values, SMS, Recovery, Android device, Apple device, other mobile device, secondary email, or phone number.

which are evidence of violations of (1) conspiracy to commit bulk cash smuggling, in violation of 18 U.S.C. § 371; (2) bulk cash smuggling, in violation of 31 U.S.C. § 5332(a)(including aiding and abetting under 18 U.S.C. § 2); and/or (3) failure to report exporting monetary instruments, in violation of 31 U.S.C. §§ 5316(a) and 5324(c)(including aiding and abetting under 18 U.S.C. § 2).

**AFFIDAVIT IN SUPPORT OF SEARCH WARRANT**

I, Manuel Ramirez, being duly sworn, states:

1.   This affidavit is in support of an application for a search warrant for the following two Facebook accounts:

(1) Facebook Account #1: Vanity Name: Manuel Sepulveda, and Account Number: 100041647125015; and

(2) Facebook Account #2: Vanity Name: Alexa Rodriguez, and Account Name: alexa.alexardz

The items to be seized, as described with particularity in Attachment B, constitute evidence of violations of federal criminal law, specifically (1) conspiracy to commit bulk cash smuggling, in violation of 18 U.S.C. § 371; (2) bulk cash smuggling, in violation of 31 U.S.C. § 5332(a)(including aiding and abetting under 18 U.S.C. § 2); and (3) failure to report exporting monetary instruments, in violation of 31 U.S.C. §§ 5316(a)[1] and 5324(c)(including aiding and abetting under 18 U.S.C. § 2); and as well as contraband, fruits of the specified crimes, other items illegally possessed, and property designed for use, intended for use, and used in committing the specified crimes.

2.   As discussed further, there is probable cause that the targets of the investigation used the subject Facebook Accounts to conspire to recruit individuals to pick up United States Currency at locations in the United States, and then conceal and smuggle that U.S. Currency to Mexico, and evade the reporting requirements for exporting U.S. Currency in amounts over $10,000 from the United States to Mexico.

---

[1]   Under 31 U.S.C. § 5316(a)(1)(A), "a person or an agent or bailee of the person, shall file a report under subsection (b) of this section when the person, agent, or bailee knowingly (1) transports, is about to transport, or has transported monetary instruments of more than $10,000 at one time – (A) from a place in the United States to or through a place outside the United States."

**TRAINING AND EXPERIENCE**

3.     I am a Special Agent with Homeland Security Investigations (HSI) and have been so employed since January 2008. Prior to employment with HSI, I was a Customs and Border Protection Officer stationed at the San Ysidro Port of Entry. I am currently assigned to the Contraband Smuggling Group 2, San Diego, California.  As part of my current duties, I investigate federal crimes related to drug trafficking, such as importation of controlled substances, in violation of 21 U.S.C. §§ 952 and 960, as well as money laundering, in violation of 18 U.S.C. § 1956 and 1957, and bulk cash smuggling, in violation of 31 U.S.C. § 5332. In the course of my duties, I have been the case agent directing drug-related investigations.  I have interviewed defendants, witnesses, and informants while conducting drug trafficking investigations. I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers, money launderers, and bulk cash smuggler.

4.     My training includes attending the Federal Law Enforcement Training Center, where I completed 19 weeks of HSI Special Agent Training. Through my training and experience, I have gained extensive knowledge in detecting elements of criminal activity as it relates to narcotics/currency smuggling, trade fraud, and money laundering. I have made numerous arrests and have conducted several investigations of such crimes related to, narcotics, money laundering, and customs fraud using a variety of investigative techniques.

5.     Based on my training and experience as a HSI Special Agent, I am familiar with the ways in which drug smugglers and traffickers conduct their business.  Indeed, during the course of my duties I have (1) worked as a case agent, directing specific drug-related

2

investigations; (2) worked as a surveillance agent who observed and recorded movements of individuals suspected of trafficking drugs; (3) participated in the execution of search warrants related to drug investigations; (4) initiated and executed numerous arrests for drug-related offenses, including possession with the intent to distribute; and (5) interviewed criminal defendants, witnesses, and informants in furtherance of investigations into the illegal smuggling and trafficking of controlled substances.   Through these duties, I have gained a working knowledge and insight into the operational habits of drug smugglers and traffickers.

6.   Based on my training and experience, and consultation with other agents, I am aware that individuals and criminal organizations involved in smuggling contraband and United States Currency often utilize cellular telephones, and communication services through internet service providers such as Facebook to recruit individuals to pick up, transport, and smuggle contraband and United States Currency.

7.   The following is based on my own investigation, consultation with other agents with decades of experience in investigating individuals and organizations involved in smuggling contraband and money, oral and written reports by other law enforcement officers, physical and electronic surveillance, interviews, subpoenaed and public records, database checks, searches, phone analysis, and other investigations.   Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation.   I set forth only facts necessary to establish foundation for the requested warrant.   For purposes of this affidavit, I have translated Spanish communications into English based on my education and knowledge as a fluent Spanish speaker.   Dates, times, and amounts are approximate.

*Facebook Search Warrant*

**PROBABLE CAUSE**

**A.    Advertisement in Facebook Account of Manuel Sepulveda**

8.    On March 20, 2020, I conducted an open source Facebook query and discovered multiple advertisements soliciting workers. I discovered a Facebook advertisement in Spanish under the vanity name "Manuel Sepulveda" (**Facebook Account #1**). Portions of the advertisement under the name Manuel Sepulveda is shown below and the following page:



4



9. The following reflects the English translation of the above advertisement on the Facebook Account for Manuel Sepulveda:

    We have openings in the San Ysidro area!!  Flexible hours per
    day, per weekend or per week.  we have base salary.  Or daily
    payment.  benefits.  Extra bonuses.  working day at your
    availability.  It is immediate work and you are pay instantly.
    We have training if required.  Nothing illegal.  Simple and
    guaranteed work! Requirements.  Have a visa or resident.  Have

5

your own car to move.  Good attitude.  punctuality.  Age does not matter.  Income up to:  1,500  2,000  3,000.

10.  On March 20, 2020, I sent a Facebook Messenger communication to the Facebook Account for Manuel Sepulveda (**Facebook Account #1)** requesting further details for the job.

**B.   Communications with Facebook Account for Alexa Rodriguez**

11.  On March 23, 2020, I received a response (as shown further) from the Facebook Account for Alexa Rodriguez (**Facebook Account #2).**



*Facebook Search Warrant*

12.   The following reflects an English translation of portions of the response that I received from the Facebook Account for Alexa Rodriguez (**Facebook Account #2)** on March 23, 2020.

- Do you have a visa, residence or citizenship?

- [Do you] own [a] car?

- We request an honest person without felonies or antecedents in the United States. The work is part time or full time. It is a crossing cash for express exchange houses in the San Ysidro and Plaza Las Americas area. We pay from 1000 to 4000 [dollars] weekly plus commissions. Appointments to clarify doubts are in Plaza Monarca or Plaza Rio, Plaza Galerias, Macro Plaza. Can be paid weekly or per day. The work is to choose from Monday to Saturday. No personal data is taken since the work can be done once a week or more depending on what you want to generate. Safe and risk-free work.

13.   On March 23, 2020, I responded to Facebook Account for Alexa Rodriguez (**Facebook Account #2)** and asked if the currency would be declared.   **Facebook Account #2** indicated the currency would not be declared.   I then asked what quantity of currency I would need to cross to Mexico to earn the 4000 dollar payment.   **Facebook Account #2** responded "$20,000."

14.   Based on the investigation there is probable cause that **Facebook Account #1** and **Facebook Account #2** may have been used to commit the crimes of conspiracy, drug trafficking and bulk cash smuggling in Mexico, the Southern District of California, and elsewhere.

7

**PRIOR ATTEMPTS TO OBTAIN THE DATA**

15.  The United States has not attempted to obtain this data by other means except as described above.  Agents have submitted preservation requests to Facebook for the subject Facebook accounts.

**GENUINE RISKS OF DESTRUCTION**

16.  Based upon my experience and training, and the experience and training of other agents with whom I have communicated, electronically stored data can be permanently deleted or modified by users possessing basic computer skills.

**FACEBOOK**

17.  Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

18.  Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account.

19.  Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual

8

Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

20. Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

21. Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or

*Facebook Search Warrant*

her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

22.  Facebook allows users to upload photos and videos.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

23.  Facebook users can exchange private messages on Facebook with other users.  These messages, which are similar to e-mail messages, are sent to the recipient's "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well as other information.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a Chat feature that allows users to send and receive instant messages through Facebook.  These chat communications are stored in the chat history for the account.  Facebook also has a Video Calling feature, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

24.  If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

25.  Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts or updates, as well as webpages or content on

*Facebook Search Warrant*

third-party (i.e., non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

26.  Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

27.  Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

28.  Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

29.  The Facebook Gifts feature allows users to send virtual "gifts" to their friends that appear as icons on the recipient's profile page.  Gifts cost money to purchase, and a personalized message can be attached to each gift.  Facebook users can also send each other "pokes," which are free and simply result in a notification to the recipient that he or she has been "poked" by the sender.

30.  Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

31.  In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform.  When a Facebook user accesses or uses one of

*Facebook Search Warrant*

these applications, an update about that the user's access or use of that application may appear on the user's profile page.

32.   Some Facebook pages are affiliated with groups of users, rather than one individual user.  Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter.  Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

33.   Facebook uses the term "Neoprint" to describe an expanded view of a given user profile.  The "Neoprint" for a given user can include the following information from the user's profile:   profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

34.   Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect

12

the fact that the user viewed the profile, and would show when and from what IP address the user did so.

35.   Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).   In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.   Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

36.   Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

**PROCEDURES FOR ELECTRONICALLY STORED INFORMATION**

37.   Law enforcement agents and investigative support personnel are trained and experienced in identifying communications relevant to the crimes under investigation.   The personnel of Facebook are not. It would be inappropriate and impractical for federal agents to search the vast computer network of Facebook for the relevant accounts and then to analyze the contents of those accounts on the premises of Facebook.   The impact on Facebook's business would be severe.

13

38.   Therefore, I request authority to seize all content, including electronic mail and attachments, stored instant messages, stored voice messages, photographs and any other content from the Facebook accounts, as described in Attachment B.  In order to accomplish the objective of the search warrant with a minimum of interference with the business activities of Facebook, to protect the rights of the subject of the investigation and to effectively pursue this investigation, authority is sought to allow Facebook to make a digital copy of the entire contents of the accounts subject to seizure.  That copy will be provided to me or to any authorized federal agent. The copy will be forensically imaged and the image will then be analyzed to identify communications and other data subject to seizure pursuant to **Attachment B**.  Relevant data will be copied to separate media.  The original media will be sealed and maintained to establish authenticity, if necessary.

39.   Analyzing the data to be provided by Facebook may require special technical skills, equipment and software.  It also can be very time-consuming.  Searching by keywords, for example, often yields many thousands of "hits," each of which must be reviewed in its context by the examiner to determine whether the data is within the scope of the warrant. Merely finding a relevant "hit" does not end the review process.  Certain file formats do not lend themselves to keyword searches.  Keywords search text.  Many common electronic mail, database and spreadsheet applications, which files may have been attached to electronic mail, do not store data as searchable text.  The data is saved in a proprietary non-text format. And, as the volume of storage allotted by service providers increases, the time it takes to properly analyze recovered data increases dramatically.

14

40.  Based on the foregoing, searching the recovered data for the information subject to seizure pursuant to this warrant may require a range of data analysis techniques and may take weeks or even months. Keywords need to be modified continuously based upon the results obtained. The personnel conducting the examination will complete the analysis within **ninety (90) days** of receipt of the data from the service provider, absent further application to this Court.

41.  Based upon my experience and training, and the experience and training of other agents with whom I have communicated, it is necessary to review and seize all electronic mails that identify any users of the subject account(s) and any electronic mails sent or received in temporal proximity to incriminating electronic mails that provide context to the incriminating mails.

42.  All forensic analysis of the imaged data will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

**REQUEST FOR SEALING AND PRECLUSION OF NOTICE**

43.  This is an ongoing covert investigation of which the targets are unaware.  In my training and experience, I believe that, if the targets or subjects of the investigation were to learn about the criminal investigation, they would take steps to destroy evidence, tamper with witnesses, flee the jurisdiction, and otherwise obstruct justice. Accordingly, it is requested that this warrant and its related materials be sealed until further order of the Court.

44.  In addition, pursuant to 18 U.S.C. § 2705(b), it is requested that this Court order Facebook not to notify anyone of the existence of this warrant, other than its personnel essential to compliance with the execution of this warrant, until **March 3, 2021**, absent further order of the court.

*Facebook Search Warrant*

## **CONCLUSION**

45. Based on the aforementioned, there is probable cause to believe that there have been violations of federal law, specifically (1) conspiracy to commit bulk cash smuggling, in violation of 18 U.S.C. § 371; (2) bulk cash smuggling, in violation of 31 U.S.C. § 5332(a)(including aiding and abetting under 18 U.S.C. § 2); and (3) failure to report exporting monetary instruments, in violation of 31 U.S.C. §§ 5316(a) and 5324(c)(including aiding and abetting under 18 U.S.C. § 2), and the Subject Facebook Accounts will contain records and data identified in Attachment B which will establish evidence of those crimes, as well as contraband, fruits of the crimes, things otherwise criminally possessed, and property used as a means of committing the crimes.

*Manuel Ramirez*
_____
MANUEL RAMIREZ
Special Agent
Homeland Security Investigations


Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone this ___3rd day of September 2020.

*William V. Gallo*
_____
HONORABLE WILLIAM V. GALLO
United States Magistrate Judge

*Facebook Search Warrant*